AIRY CROSS, CHARLES CROSS AND OTHERS *vs.* WILLIAM BLACK.—*December*, 1837.

An acknowledged exception to the rule, which prohibits a party from producing his own declarations in his favor, is, where such declarations are necessary to explain an act, which takes its *character* from the *design and intention* of the party who does it.

Declarations made by the owner of slaves, when about to remove with them from this state, and when making preparations for that purpose, are admissible evidence, upon a petition filed by such slaves against the owner for freedom, to shew the place to which the owner intended to remove; though the petitioners had offered no evidence of his declarations made at the same time and place.

As a general rule, the verdict upon a petition for freedom, being freedom *vel non*, must be for the defendant, unless a title to freedom is made out by the petitioner.

It was not the design of the act of 1831, ch. 323, to restrict, in any manner, the acknowledged rights of masters in reference to slaves residing in this state, nor to prevent their being taken or sent out of the state, to travel or sojourn, for mere temporary purposes.

A citizen of *Maryland* intending to break up his establishment, and leaving this state with his slaves, with the avowed design of becoming a resident of another state, and actually going out of the state in pursuance of such design, may, before he reaches the point of his intended destination,

change his purpose, and return with his slaves, without forfeiting his title to them; to subject him to such forfeiture, there must be an actual consummated design, to remove and place them elsewhere permanently.

APPEAL from *Anne Arundel* county court.

This was a petition for freedom filed on the 23d March, 1835, by *David Cross, Airy Cross,* and their children, *Charles, David, Perry, Mary, Harriet* and *James.* The petition alleged, that the appellee, while in the possession of the petitioners and residing in *Maryland,* removed with the said petitioners to the state of *Ohio,* and became a resident, with the intention of becoming a resident and citizen thereof. That while in the state of *Ohio,* the said *William* manumitted the petitioners, and they became free according to the laws of *Ohio*; that afterwards, the said *William* determining again to return to the state of *Maryland,* and become a citizen thereof, compelled your petitioners to remove with him into *Maryland,* under the false pretext, that they were still his slaves; and that the appellee still retains them as slaves, though they are entitled to their freedom. Prayer, to be adjudged free, &c. The appellee appeared, on which issue was joined, upon the right of the petitioners to their freedom.

1st EXCEPTION.—At the trial, the petitioners to maintain the issue joined on their part, offered proof to the jury, that the defendant claiming to be the owner of the petitioners, and holding them in slavery, went from this to the state of *Ohio,* carrying with him all of the petitioners, and after remaining there for some time, returned himself to this state, and brought with him all of the petitioners.

They then offered in evidence, declarations of the defendant to *Zimmerman,* a witness examined in this cause, made in August, 1835, about two months before his departure from this state, as aforesaid, that he intended to go to the state of *Ohio,* and that he urged the petitioner *David* to go there with him, stating to him, that he could not get his freedom in *Maryland.* That it was necessary for the petitioners to go to *Ohio* in order to be manumitted; that he, the defendant, intended to set them free there. The plaintiffs, also, offered

certain depositions, returned with a commission, which had been issued to the state of *Ohio*, taken upon interrogatories filed by both parties.

*Woolsey Welles*, on part of the petitioners, deposed; that he saw *William Black* at *Palmyra*, in *Ohio*, on the 21st November, 1835, with his wife and two sons and the petitioners, eight persons, very slightly tinged with *African* blood, and a light colored mulatto girl. *Black* said he was going to *Mercersburg*, *Pennsylvania*, where a brother of his resides. That Exhibits No. 1, 3, and 4, were drafted and witnessed by deponent, that he saw *Black* and his wife sign them. That Exhibit, No. 2, is in the hand writing of *John Curtis*, and signed by *David Cross* and *William Black* in the presence of the witness, after the execution of the deeds of manumission of *David* and *Airy Cross*. That Exhibits 1, 2, 3, and 4, were executed by *Black* and his wife freely and voluntarily, without any threats of personal or other injury to himself or family, or any of them, and without any circumstances calculated to produce a reasonable apprehension of personal or other injury to himself or family, or any of them. The witness further deposed, that he told said *Black*, before the execution of any of the papers, that he, the witness, had in his possession, a writ of *habeas corpus* directed to *Black*, commanding him to bring the coloured persons in his custody, and whom he claimed as slaves before the judge who issued the writ; that if that writ was served upon him, he would have to go with the slaves before the judge, and that inasmuch as the laws of *Ohio* providing for retaking and reducing again to slavery of fugitive slaves, only spoke of 'blacks and mulattoes,' the probability was, the judge would discharge from his custody, all those who have not a sufficient amount of *African* or negro blood, to come under the description of mulattoes or blacks. The witness stated he had such a writ in his possession, it was never served on *William Black*, and that the opinion he then expressed to said *William Black*, was his honest opinion. *Black* said he thought it morally wrong to hold his fellow-men in slavery; and had intended to give

freedom to his slaves, and after the execution of the deeds of manumission, he asked what was to pay for drafting them, and being answered, not any thing, he expressed his thanks for making out the papers : witness has no distinct recollection of what *Black* said in relation to his intended residence, but thinks he said, he intended to go to *Missouri* : that the justice of the peace, *James Magill,* who took *Black* and wife's acknowledgment, was an acting justice, and was so reputed, and witness has no doubt he was a lawful justice according to the laws of *Ohio.* As to his general character witness cannot speak understandingly, nothing against his character, but that he drank ardent spirits : that the witness *Daniel M. Lathrop* is a minister of the gospel of the *Presbyterian* denomination ; his once having failed, so that he cannot preach the gospel, he has been engaged for a year or more, as editor of the *Ohio Atlas.* He is a man of good character, would be believed any where in the *Northern* part of *Ohio,* where he has been extensively known as an agent of the *American Home Missionary Society.* The other witness to the deed of manumission is *John Curtis,* a student of law, lives in *Brownhelm,* in *Ohio,* a member of the *Presbyterian* church, and to be relied on, where known. That witness, *Woolsey Welles,* is an attorney at law, and not aware of any law of *Ohio* in relation to negroes residing there *temporarily* with their owners : that slavery is prohibited by the constitution of *Ohio,* and knows of no law relating to manumissions.

Upon cross-examination, *Welles* deposed as follows ; 'that he resided in the village of *Elyria, Loraine* county, *Ohio,* where he has resided since July, 1835. From that time back to June, 1834, he was travelling (as the agent of the *Ohio State Temperance Society,*) in various parts of the state of *Ohio,* principally in the *Miami* country, and on the *Western Reserve;* from that time back to May, 1826, he had resided in *Akron, Portage* county, *Ohio,* engaged in the practice of law, as a justice of the peace, a collector of canal tolls on the *Ohio Canal,* and as a post master, which latter

office he resigned a few months before he entered upon his agency for the *Ohio State Temperance Society*. From *May*, 1826, back to *December*, 1823, he resided in *Elyria*, aforesaid, where he practised law. From that time back to September, 1819, he resided in *Cleveland*, *Cuyahoga*, *Ohio*, engaged in the study of the law, and teaching school, and for a short time as a clerk in a store, From that time back to 1808, he resided for the most part in his father's family in *Lerveille*, *Lems* county, *New York*. From that time back to the year, 1862, he resided in his father's family in *Lanesborough*, *Berkshire* county, *Massachusetts*, where, if the family Bible record be true, he was born on the 26th *May*, 1802. That what led to his acquaintance with *William Black*, was information that the said *Black* was in possession of a number of persons, nearly of white colour, whom he claimed as slaves, and to whom he had promised liberty. He told his own name, and there was with me at the time I became acquainted with him, *Daniel W. Lathrop*, *John Curtis*, and a citizen of *Edinburgh*, a township adjoining *Palmyra*, by the name of *Greenbury Keen*; that *Black* stated to the witness, at the time he first saw him, that he claimed all the persons in his custody, except *David Cross*, as his slaves, to wit: *Airy* wife of *David*, *Charles*, *David Perry*, *Mary*, *James* and *Harriette*, their children, and *Maria Thornton*, a yellow girl; that he was undetermined whether he should go to *Virginia*, to *Maryland* or to *Pennsylvania*; he told us he was a cooper by trade, and that either *David Cross* the elder, or *Charles Cross*, was also of that trade; his (*William Black's*) wife and two sons were with him at the same time. This witness further proved, that the Exhibits 1, 2, 3, 4, were executed in the presence of the slaves; he cannot say they expressed a desire for them. They were evidently under constant fear of their master or mistress; their conduct and conversation was different when in, and out of their presence. The papers were executed at *Palmyra*; that within an hour or two after the execution of the papers, *William Black* and family started with their teams and the coloured

persons, from *Palmyra*, eastwardly, intending, as he then said, to go to *Mercersburgh*, in *Pennsylvania*; he heard *Black* say he intended to manumit his slaves, and that he did not believe it morally right to hold them. Witness has heard *Curtis* express opinions that slave-holding is a sin against God. That he (*Curtis*) and *Lathrop* are members of an *Anti-Slavery Society*; that no consideration was given for the manumission deeds. Witness considers slavery as a sin, and would consider it no immorality, in aiding a slave to escape from his master. Another witness proved, that *Black* had admitted *David Cross*, the father, to be free; that the mother was in part paid for; that the children would be freed by him at certain ages : and the slaves were then inquired of, whether if he, *Black*, would manumit them, they would serve him, and enter into agreement to that effect, until the time of liberation arrived? That *Black* executed the deeds voluntarily, without any apprehension or grounds of damage, either to himself or his family. Other witnesses were examined under the commission, to the same effect.

EXHIBIT No. 1, was a deed from *William Black* and wife, manumitting *Maria Thornton*, (the yellow girl) in consideration of her faithful services, theretofore rendered, and the good will and affection which the said *Black* had for her.

EXHIBIT No. 2, was a contract, setting forth that the children of *David* and *Airy Cross*, had theretofore been the slaves of *William Black*, and in consideration of manumission, the children agreed to serve him respectively, until they reached the age of twenty-five years.

EXHIBIT No. 3, was the manumission by *Black* and wife, of *David* and *Airy Cross*, and their six children.

EXHIBIT No. 4, was the contract of *Maria Thornton*, with *David Cross* as her surety, that in consideration of liberty, the said *Maria* should serve *Black* until she was twenty-five years of age.

These Exhibits were dated 21st November, 1835; and executed and acknowledged at the same time, and before the same witnesses.

The defendant then offered to prove, that the witness resided in the same house with the defendant, for more than six months next preceding the day on which the defendant left the state of *Maryland*, and that frequently, during that time, the said defendant informed the witness, whilst he was making arrangements for that purpose, that he was about to remove from this state to the state of *Missouri*; and on the day the defendant left home for the west, he told the witness, that he, the defendant, was going to settle in *Missouri*; and that some time before his departure, and while he was making his preparations, as before stated, the witness promised the defendant to make inquiries, as to what part of the state of *Missouri* one *Edward W. Dorsey* resided, which *Edward W. Dorsey* had formerly resided in *Maryland*, and was acquainted with said defendant : and the witness did make such inquiries, and did ascertain where the said *Dorsey* resided in *Maryland*, and did inform the defendant thereof; and he understood from the defendant, that he, the defendant, intended to settle in the neighbourhood of *Dorsey*. Of any declarations by the defendant, at the time, or in the places aforesaid, when and where the conversations aforesaid, offered in evidence by the defendant took place, the petitioners had offered no proof. Whereupon the petitioners, by their counsel, objected to the admissibility in evidence for the defendant, of each and every part of said declarations, conversations and inquiries. But the court overruled the said objections, and admitted the whole of said evidence to go to the jury, to prove with what intent, the defendant left *Maryland*, and to what state he intended to go. The petitioners excepted.

2d EXCEPTION.—The petitioners offered evidence to prove, that in the month of August, 1835, the defendant, in the presence of *David Cross*, one of the petitioners, told the witness that he, the defendant, was about to go to the state of *Ohio*; that he then intended to set *David* and his family, the petitioners, free; that *David* had already served out his time, and was at the time of the conversation, entitled to his free-

dom; but that according to the laws of the state of *Mary-land*, he could not be free; that he intended to go to *Ohio*, because there *David* and his family might enjoy their free-dom; that he intended the children of *David*, the petitioners, except *Airy*, who is *David's* wife, should serve him, the de-fendant, a certain time by indenture, as apprentices, before they should be free. That defendant further stated to the witness, that *David* refused to go to *Ohio* with him, the defendant,—that the witness then urged *David* to go with defendant, in order to secure the freedom of himself and family, to which *David* afterwards assented. The petitioners further to maintain the issue joined on their part, offered to prove, by another witness, that some time in the fall of 1835, the defendant left his former residence in *Anne Arundel* county in the state of *Maryland*, after having sold and dis-posed of his real and personal estate, with the avowed inten-tion of removing himself and family, and the petitioners, whom he claimed as his slaves, to the west; that the defendant sold off his crops, farming utensils, and other property in this state, except such as he intended to carry away with him; and that when the defendant left the state, he took with him his wife and children, and petitioners, with the avowed in-tention of settling in one of the western states. That after-wards, some time in the month of December, 1835, the said defendant returned to the state of *Maryland*, with his wife and children, the petitioners also returning with him. That afterwards, some time in the month of January, 1836, the defendant told the witness, that he had been in the state of *Ohio* with his family and the petitioners aforesaid, where he had remained some time, and had there manumitted the peti-tioners. That *Charles*, one of the petitioners, was entitled to be free after he, *Charles*, had served the defendant for a certain term of years then specified, according to inden-tures of apprenticeship, executed in *Ohio*. That the defen-dant then offered to dispose of said term, which the said *Charles* was to serve defendant, to the witness, for a sum of money, stating he intended with the money he should receive

for *Charles'* time to purchase a slave for life. The petitioners further to support the issue on their part, offered without exception, the evidence taken under the commission before referred to, and set forth in the first bill of exceptions.

The defendant then offered proof to the jury by several witnesses, that said defendant had, at various times, from six months before, to the very day on which he left the state of *Maryland*, declared to said witnesses, that it was his intention to go to the state of *Missouri* to reside. That when advised a short time before he left the state, by one of the witnesses, to go to the state of *Ohio*, and there reside, he objected to doing so, because he could not there hold his negroes in slavery, and that he did leave *Maryland*, and on the day he departed he said he intended to go to *Missouri*, and that in the progress of his journey he went to the residence of his brother in the state of *Ohio*, where he remained about two days and a half. That he was induced to make said visit to his brother, because the latter had assured him that he would go with defendant to *Missouri*; that his said brother being unable to go with him to *Missouri*, on account of the sickness of his family, the defendant then left his brother's house, with a view to get to the *Ohio* river, and to go upon said river to *St. Louis*, in *Missouri*; that upon his way from the residence of his brother to the *Ohio* river, he was overtaken in the village of *Palmyra*, and with his wife, forced by a large collection of persons to sign instruments of writing, purporting to be deeds of manumission of all the petitioners, which said deeds were read in evidence by said petitioners. That in consequence of this forcible interposition, he determined to return to *Maryland*, and immediately bent his way in that direction; where, without stopping, except in the usual manner of travelling, he arrived in the month of December, 1835, the said negroes voluntarily returning with him; and the defendant further proved, that the petition for freedom by the plaintiffs was filed in March, 1836. He also proved that the said negroes constituted the greater and more valuable part of the defendant's property, and that the residue of said

property consisted of some six or eight hundred dollars in money, which he took with him, and a few blacksmith's tools of little value, which he left with the witness, to be sent to him at *St. Louis*, and of a few debts, or evidences of debt, which were in the hands of the witness for collection, and that on the return of the defendant to *Maryland*, he went with his family to the house of the witness, who was a distant connection of the defendant, and he, and they, have remained there to the time of filing the petitions in the cause; and that shortly after his return, the defendant advised with his friends as to the course he should pursue to assert his rights to said negroes, and that he had by advice of some or other of his friends, sent *Charles* out of the state, and there sold him as a slave for life, before the filing of the petition in the cause, and that the instruments of writing under which the petitioners claim their freedom, were in possession of *David*, the father, one of the petitioners, and that the defendant had been advised to permit said petitioners to retain said instruments, in order that the petitioners might have an opportunity of trying their right to freedom under the same; and that the said instruments were permitted to remain with said petitioners, until he delivered them to his counsel.

The petitioners, thereupon prayed the court to instruct the jury, that if the jury should be of opinion, from the evidence, that the defendant, with the avowed intention of leaving *Maryland*, and settling in the state of *Missouri*, or other of the western states, disposed of all his property, except so much as he intended to carry with him, or to be sent to him in *Missouri*, and that he abandoned his residence in *Maryland*, in the month of October, 1835, for the avowed purpose of settling in *Missouri*, or some *western* state, and carried with him the whole of his family, and the petitioners, leaving no other slaves behind him; that he went from his past residence to *Ohio*, and remained there for some time, and after being there for some weeks, determined, for the first time, to change his route, and return again to *Maryland*; that he accordingly did return in December, 1835, bringing with

him for sale, or to reside within this state, the petitioners, who are mulattoes, claimed by him, and for some time held by him as slaves, then the defendant is not entitled by the laws of this state, to hold them in bondage.   Which instruction the court, (*Dorsey, Ch. J. Wilkinson, A. J.*) refused to give.   The petitioners excepted.

The jury found *David Cross,* the father, to be free, and that the others are not free persons.   The judgment of the court being against them, they brought the present appeal.

The cause was argued before BUCHANAN, Ch. J. STEPHEN, ARCHER, and CHAMBERS, Judges.

RANDALL and A. C. MAGRUDER, for the petitioners :

On the first exception contended, that the defendant could not offer in proof any declarations of his own, whether before or after his removal from *Maryland,* to establish his right to hold the petitioners as slaves.   Those declarations being, as it is stated, no part of any conversation, of which the petitioners had offered proof.

2. In support of the second exception, they contended, that as the petitioners were carried by their then master, out of the state of *Maryland,* and kept in his service, no matter in what other state, for some time, he had no right to bring them back into *Maryland,* and having brought them back, in violation of the act of 1831, ch. 323, he is no longer allowed to hold them in bondage.

On the first exception they cited, 2 *Starke,* 253, 254. *Roscoe on Evidence,* 25.   *Heane vs. Rogers and Lloyd,* 17 *Ser. and Low.* 449.

On the argument of the second exception, they cited, acts of 1783, ch. 23.   1796, ch. 67.   1802, ch. 70.   1813, ch. 56.   1812, ch. 76.   1818, ch. 201.   *Boisneuf vs. Lewis,* 4 *H. and McH'y,* 414.   *Hunter vs. Fulcher,* 1 *Leigh Rep.* 172. *Stewart vs. Oakes,* 5 *Har. and John.* 107.   *Acts of* 1831, *ch.* 323 *sec.* 4.   1832, *ch.* 40.   1832, *ch.* 296.   1833, *ch.* 122.

*1834, ch. 124. 1834, ch. 75. Chitty, L. N. 38. 1 Kent Com. 76. Bland vs. Downing, 9 Gill and John.*

HAMMOND and ALEXANDER, for the appellee, insisted :

1st. That the declarations made by the appellee, at, and about the time of his departure from *Maryland*, were properly admitted as evidence of the intention or purpose of his journey. That such declarations made, when there existed no motives for concealment or untruth, furnish the best possible evidence of intention, and are especially admissible against the appellants, who claim their freedom under acts of the defendant, *subsequent* to those declarations.

2d. That the court below did right in refusing the instruction prayed for in the second exception, because there was no evidence, from which the jury could presume, that the defendant had brought the appellants into this state, either to be sold or to reside therein—and

3d. Because upon all the evidence, the jury were bound to find that the defendants had been lawfully introduced into this state.

4th. That where a citizen or inhabitant of this state, removes beyond its limits, carrying with him his negro slaves and other property, but returns before he has acquired a residence elsewhere, with a view of remaining with his negroes permanently here, the slaves are not entitled thereby to their freedom by the laws of *Maryland.*

5th. That the appellee had offered competent evidence to shew, that his journey to his proposed place of residence was abandoned, on account of violence which had been offered to himself and family, and which act of violence materially impaired the ostensible title to his slaves.

6th. That if all the facts in the prayer of the petitioners were found by the jury, it would not follow that the petitioners were free.

On the 1st Exception, they cited : *Phil. Evid.* 218. *Bateman and another vs. Bailey,* 5 *Term Rep.* 512. *Newman vs.*

v.9

*Stretch,* 1 *M. and M.* 338. *Vincent et al vs. Prater,* 4 *Taunt.* 603. 5 *Har. and John.* 97. 4 *Har. and John.* 243.

On the argument of the 2d Exception, they cited : 2 *Kent Com.* 430. *Murray vs. M'Carty,* 2 *Munf.* 397. *Rankin vs. Lidia,* 2 *Marsh,* 476, 477. 1 *Star. Ev.* 747. *Ros. Ev.* 21, 22. *Williams vs. East India Co.* 3 *East.* 199. *The King vs. Hawkins,* 10 *East.* 211. *Hanley vs. Pepper,* 3 *Barn. and Al.* 386. 4 *Har. and John.* 282, 11 *Pet. S. C.* 73.

CHAMBERS, Judge, delivered the opinion of the court.

The first exception presents the question, whether the declarations of the appellee were properly admitted in evidence. We think they were. One of the acknowledged exceptions to the rule which prohibits a party from producing his own declarations in his favour, is, where such declarations are necessary in explanation of an act, which takes its *character* from the *design and intention* of the party who does it. The declarations made at a time, when occasioned by no perceptible motives of interest, like other circumstances surrounding an act, are in such instances considered as part of the *res gestæ.* Here the act was the removal of the appellee ; the act of breaking up, and going from his former residence to another, which he designed to occupy. There are no facts disclosed on the record, nor have any such been suggested, which could possess the mind of the appellee at that time with the belief, that his interest was involved in declaring his removal to be with intention to settle in *Missouri.*

It is said, these declarations did not tend to affirm or deny any fact involved in the issue ; but by the very language of the petition itself, the freedom of the appellants is claimed, amongst other reasons, on the ground, that the appellee removed with the petitioners to the state of *Ohio,* and became a resident, or with the intention of becoming a resident and citizen thereof.

Again, it is said, the declarations were made, or some of

them, long anterior to the period when the appellee left the state of *Maryland*; but it is expressly alleged in the exception, that all the declarations offered, were made while the appellee was making his preparations for his removal. It is further urged, that to admit this testimony, would be to contradict the rule of evidence, which denies to a party the right to contradict his declarations, when they have been made the foundation upon which an act is done, or a liability or expenditure incurred by another. We do not think in this case, the facts justify the application of that well established rule of evidence. The petitioners were the slaves of the appellee before his removal by the concession of their counsel; and if it could be shewn, that they had been influenced to do any act, or consent to its being done, in consequence of the declarations of their owner, (which however does not appear to have been the case,) we should not consider the rule as applicable to parties standing in the relation of master and slave.

The *second* exception raises the question; what is the true construction of the act of 1831, chapter 323, in reference to negro slaves, under the circumstances which exist in this case?

We cannot agree with the appellee's counsel, that there was not evidence in the cause tending to prove the facts assumed by the appellants' motion. The voluntary return of the appellee into this state with his servants, and his remaining here in the situation and under the circumstances proved at the trial, were quite sufficient to authorize the petitioners to introduce into their statement, the fact of his *return to reside*, as one, which the jury might find, and of course, would forbid the court the right to reject the prayer, as not being justified by any thing offered in evidence.

We do not deem it necessary to decide, how far the peculiar point to which the instruction was directed, *to wit*, whether under the facts assumed, the appellee "was not entitled to hold the petitioners in bondage" would have excused the court from gratifying the motion. As a general rule it is certainly true, that the issue in a petition for free-

dom, being freedom *vel non*, the verdict must be adverse to the petitioner, and consequently in favour of the defendant, unless a case of freedom is made out, and the title of the defendant in the petitioner, need not be sustained by proof, if the evidence shows that the petitioner is not free.

We prefer to meet the true question involved in the case, which is, whether a citizen of *Maryland* intending to break up his establishment, and leaving this state with the avowed design of becoming a resident of another state, and actually going out of this state, in pursuance of such design, may, before he reaches the point of his intended destination change his purpose, and return into *Maryland* with his slaves who had accompanied him, without violating the act of 1831, chapter 323. We acquiesce in the opinions expressed by the appellant's counsel, that the policy which directed the system of laws, of which this is a part, was designed, not only to avoid the introduction of slaves who had not previously been domesticated in the state, but also to forbid the return of those, who having once been domesticated in the state had ceased to be so, and had been removed to some other place.

The difficulty consists, not in ascertaining the general rule of policy, or the general rule of the law, by which the legislature has announced its purpose to pursue it, but in the application of that rule to a particular state of facts.

The law is expressed in terms the most universal; in the *first* paragraph of the *sixth* section, copying *verbatim* the language of the act of 1796, chapter 67, it shall not be lawful to import or bring into this state by land or by water, any negro, mulatto, or other slave, for sale, or to reside within this state.

The subsequent provision excepts from this general clause, the case of non resident owners, who employ their slaves on the islands in the *Potomac* river, and also the case of persons holding lands both in this state and in another state within the distance of ten miles, &c.

The act is penal in its character, and subjects the party offending against its provisions to indictment.

A literal interpretation will include this case, as doubtless the petitioners were "brought" into this state in one sense of the term; and it therefore becomes necessary to consider, whether with a due regard to the existing mischiefs to be remedied, the means of redress designed, and the actual consequences attending a literal interpretation of this act, it will effect the purposes of the legislature to construe it according to its strict letter.

The evil complained of was not the objectionable exercise of doubtful rights of property by masters, in reference to slaves permanently situated in the state. From our earliest history, masters had been accustomed to take or send their slaves out of the state for purposes obviously temporary. The legislature had secured to citizens of other states, the privilege of having their slaves here while "travelling or sojourning," and the most liberal judicial construction has been given to these provisions. *Baptiste vs. De Volunbrun*, 5 *Har. and John.* 86, and the case of *De Fontaine vs. De Fontaine*, there cited. It could not then be the design of this statute, or the older statute, from which this portion of it is copied, to deprive a citizen of *Maryland* of the privilege elsewhere, which every citizen of every other portion of the Union can enjoy in this state. Yet if the letter of the act be adhered to, it will effectually produce this result; in as much as in every such instance, where a slave has been carried out of the state by his master to travel or to sojourn, his being again "brought" into the state, if for sale or to reside, is a criminal act, involving a forfeiture of the property, and if the master can neither sell him nor require his services as a resident servant, he is useless and expensive.

Against such a construction we may well oppose the universal opinion and practice, during the whole period embraced by this system of legislation, commencing in 1783. We know that our citizens have constantly taken their slaves with them, when visiting other states, and have returned

with them into *Maryland*, have sent them out of the state for a mere temporary purpose, without the presence of their masters, and have had them to return again, and no doubt has been expressed, as to the power to do so without hazard to their title in such slaves.

The act of 1831 did not restrict in any manner the acknowledged rights of the master, in reference to slaves located in the state; nor did it design to embarrass him with conditions, which according to the familiar habits of our citizens, would refuse him the services of his slave in duties of everyday's occurrence; consistently with such a literal application of this language, it would be impossible for our citizens to travel by the regularly established mail roads, from one portion of the state to another, without violating the law, and forfeiting his property, if he should insist on having his slaves to minister in their accustomed offices to himself and his family, because, as is in some instances the fact, such a journey would be in part over the territory of another state, and yet the same indulgence is expressly secured to the master with slaves from any other state.

The necessity for such exceptions to the strict letter of the provision is manifest. The counsel admit it. The principle of the exception, we think, governs the case before us.

There must be a termination in the relative duties of protection and obedience, which had existed between the state and the resident slave—not a design or purpose only to terminate these relations, but an actual consummation of such purpose by the active agency, or positive assent of the owner; a purpose to remove them out of the state permanently, and place them elsewhere, and this being consummated, the master then assumes the attitude of the owner of non-resident slaves. The case of *Bland and Beverly*, 9 *Gill and John.* has been referred to, as establishing a doctrine differing from that we have declared. We think it quite in accordance with all we have said. That case went upon the ground that the owner of the slave assented to his leaving the state for a permanent purpose, and thereby placed the

slave in the attitude of a non-resident, the assent to his leaving the state being equivalent to his being carried out by his owner, and consummating the design of a permanent removal. The case made by the petitioners in this second exception, does not consummate the purpose of a permanent abandonment of the state. The numerous mischiefs suggested in argument would inevitably result, if the master could be considered as having lost his claim, to be considered a citizen of *Maryland* before he had become a resident of another place, placing him at the mercy of all who might officiously or malevolently oppose his just claims to the quiet enjoyment of his property, and denying him the character of a citizen of any one of the states, in which character alone, he could invoke the aid of the laws, and legal tribunals of that government, which is common to all the states.

The itinerant and unsettled condition of the master will give character to the condition of his slaves. They are to be considered as attached to his person; dependent on his movements; and their will is merged in his. Their return with him, therefore, under the circumstances we have been considering, must be regarded, like his, as the termination of a temporary absence, which will not constitute an importation within the meaning of the acts of assembly.

These views lead us to concur with the opinion expressed in the second exception.

JUDGMENT AFFIRMED.